# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 09-33-1 |
| RASHAAN BATES | : | |

August 26, 2010                                                            Anita B. Brody, J.

## MEMORANDUM

On January 20, 2009, a grand jury returned a four-count indictment charging defendant Rashaan Bates with possession with intent to distribute 100 grams or more of heroin (Count I), possession with intent to distribute cocaine base ("crack" or "crack cocaine") (Count II), distribution of cocaine base (Count III), and possession of a firearm in furtherance of a drug trafficking crime (Count IV). On June 24, 2010, a jury returned a guilty verdict on Counts I, II, and IV of the indictment. The jury acquitted Bates on Count III.

On July 27, 2010, Bates filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 and a motion for a new trial under Federal Rule of Criminal Procedure 33. For the reasons that follow, I will deny these motions.

I. BACKGROUND[1]

Between 4:00 and 6:00 PM on October 7, 2008, Officers Richard Woertz and Brian Myers of the Philadelphia Police Department ("PPD") met with a registered confidential informant ("CI") and instructed the CI to attempt to purchase drugs on the 1400 block of Lardner Street. The 1400 block of Lardner Street is located between Castor Avenue and Large Street. Woertz and the CI prepared for the transaction at a staging area on Castor Avenue, just north of Lardner Street. Woertz searched the CI and confirmed that the CI held no contraband. Woertz also gave the CI $20 in pre-recorded buy money. The CI then left the staging area.

On that same evening, PPD Officer Harold Toomer conducted surveillance on the 1400 block of Lardner Street. Toomer sat in a vehicle parked towards the middle of the block, close to 1436 Lardner Street. Toomer saw Bates exit 1474 Lardner Street, but was unable to see if Bates locked the door as he exited. Bates then walked across the street and sat on the lower steps of 1471 Lardner Street. A short time later, Toomer saw the CI walking east on Lardner Street from Castor Avenue towards Large Street. The CI stopped at 1471 Lardner Street and talked to Bates. Toomer saw the CI hand Bates U.S. paper currency. Toomer testified that he also saw Bates reach into his coat pocket, retrieve small objects, and hand them to the CI.[2]

---

[1] On Bates' Rule 29 motion for judgment of acquittal on the basis of insufficiency of the evidence, I review the evidence in the light most favorable to the Government. In discussing Bates' Rule 33 motion for a new trial, I exercise my own judgment in assessing the Government's case. Because I found the Government's witnesses credible on all material facts, the facts as stated in this section are equally applicable to both motions. I specifically note where I consider additional facts solely for purposes of the Rule 33 motion.

[2] On cross-examination, Toomer admitted that only one object was exchanged.

2

Woertz was unable to see what happened on Lardner street from the staging area. Approximately five to ten minutes after the CI left the staging area, however, the CI returned to Woertz and handed him a red plastic packet of crack cocaine. The CI also provided a cell phone number for the alleged seller.[3] Woertz turned over the packet and the phone number to Myers.[4]

The next day, approximately fourteen PPD officers, including Toomer and Myers, went to Lardner Street to execute search warrants on 1446 and 1474 Lardner Street. As they approached, Toomer saw Bates sitting on the upper steps of 1471 Lardner Street. Bates was seated next to another male. Toomer recognized Bates as the man he saw sell drugs to the CI just one day earlier. Toomer and his partner, Officer Marshall Kelly, approached the two men. Toomer secured Bates and Kelly secured the other male.[5]

As they approached, Toomer ordered Bates to show his hands. Bates complied. On Toomer's instruction, Bates placed his hands on the side of the building and Toomer proceeded to pat him down. After feeling a bulky object in Bates' front waistband, Toomer handcuffed Bates. Toomer then removed the bulky object and discovered that it was an Intratec 9mm firearm. Toomer secured the weapon by removing the magazine and the round of ammunition that was in the chamber. Toomer later turned over the firearm to Myers.

---

[3] Woertz paid the CI $20 for his successful buy.

[4] Myers was the assigned investigator for this investigation. The assigned investigator is the person who handles all the paperwork.

[5] Kelly handcuffed the other male and searched him, but found no drugs. Myers ultimately told Kelly to release the second male.

While Toomer secured Bates' weapon, Kelly searched Bates. Kelly found twelve blue packets of crack cocaine. All twelve packets were contained in a clear plastic bag. Kelly confiscated the crack and turned it over to Myers. Neither officer found any money on Bates. The officers also failed to recover a cell phone.

Meanwhile, other PPD officers searched 1446 and 1474 Lardner Street. Sergeant Robert Friel supervised the unit that searched 1446 Lardner Street. At the time of the search, two women were inside 1446 Lardner Street. Officers found marijuana and unused red packets in the building.[6]

After executing the search warrant on 1446 Lardner Street, Friel went to 1474 Lardner Street. When he arrived at 1474 Lardner Street, police had already entered the residence. Friel testified that the officers probably entered 1474 Lardner Street by ramming the door to the building. No other officers provided an alternative explanation for how they might have entered the building. From 1474 Lardner Street, Friel walked across the street to Bates. Friel recovered a key from Bates and returned to 1474 Lardner Street to test the key on the front door of the residence; the key successfully operated the lock. Friel turned over the key to Myers.

1474 Lardner Street was vacant at the time of the search. Inside, however, Myers saw bulk heroin, packaged heroin, and heroin paraphernalia on a table in a bedroom on the second floor.[7] The amount of heroin totaled over 100 grams. Some of the heroin was contained inside

---

[6] Myers decided there was no need to investigate the marijuana recovered at 1446 Lardner Street because it was a very small amount of marijuana.

[7] Myers initially participated in the search of 1446 Lardner Street and later proceeded to 1474 Lardner Street.

4

360 white glassine packets with a "Chicago" stamp on them. Some of the heroin was in bulk form. The heroin paraphernalia, including grinders, a scale, a strainer, a spoon, and a credit card with the name Yajaira Batista, was covered in residue. Myers also saw unused blue, white, and clear glassine packets. Myers testified that the packets in 1474 Lardner Street were a different type of packet than the twelve blue packets found on Bates.

Officers also found a tally book inside 1474 Lardner Street. Myers explained the book: "Usually the numbers indicate what's owed or what was given out. This is how they keep track of who has what, who owes what money, who has what product narcotics wise." (TR22 at 216.)[8] The words and names in the tally book were largely in Spanish.

It is undisputed that Bates lived with his mother at 1474 Lardner Street from August 2007 to September 2008.[9] It is also undisputed that, by October 8, 2008, the residence was vacant. When officers searched 1474 Lardner Street, they found no proof of residence for Bates. They also failed to recover any personal items linking Bates to the apartment. Myers testified about the interior of 1474 Lardner Street:

> When you first walk into 1474 Lardner Street, you walk into a living room. I remember there was a couch and a TV. That was the only thing down there. There was nothing in the kitchen, nothing in the dining room. As you walk in the front door to your right, there was stairs to go upstairs, you go upstairs. In the front room there's a table and I think one or two chairs. No bedroom set that I remember and no other furniture in any other -- I think there was two other bedrooms but no furniture in them.

---

[8] The June 22, 2010 trial transcript is cited as "TR22." The June 23, 2010 trial transcript is cited as "TR23."

[9] The Government provided evidence that Bates' January 26, 2008 drivers license listed 1474 Lardner Street as his residence.

(TR22 at 179.)[10]

After completing the searches of 1446 and 1474 Lardner Street, Myers called the phone number that the CI gave Woertz. Myers explained that he called the number because officers recovered cell phones from 1446 Lardner Street and he wanted to see if any of the numbers matched. When Myers dialed the number, none of the cell phones from 1446 Lardner Street rang. No cell phones were recovered from 1474 Lardner Street.

At trial, Detective Andrew Callaghan offered his expert opinion that Bates possessed the blue packets of crack cocaine with intent to distribute. Callaghan explained that he reached this conclusion because:

- No user paraphernalia was seized from the defendant. Crack users tend to carry user paraphernalia so that they can smoke the crack.

- Bates possessed a firearm. Callaghan believed that "it's highly unlikely that a crack addict would possess a firearm" for two reasons: (1) because, in Pennsylvania, it elevates the crime from a misdemeanor possession charge to a

---

[10] The defense elicited the testimony of Tom Zhang, a real estate agent who managed 1474 Lardner Street. Because Zhang's testimony regarding the lease on the property was undisputed, I consider it on both the Rule 29 and Rule 33 motions. Zhang explained that Loriann Scipio, Bates' mother, is one of his tenants. Scipio resided at 1474 Lardner Street from August 9, 2007 to September 10, 2008. On September 16, 2008, Scipio returned the keys to 1474 Lardner Street. On September 17 or 18, Zhang inspected the property. Zhang confirmed that the property was vacant: all the furniture was removed and no one resided there. When he left, Zhang installed a combination lockbox on the front door. The lockbox enabled real estate agents to show the property so long as they had the proper code. If a real estate agent successfully entered the code, the lockbox opened and the agent could remove the keys to the door from the box. Zhang explained that there are two different locks on the front door to 1474 Lardner Street; each lock uses a different key.

felony gun charge and (2) because most crack addicts will sell their possessions, including a firearm, for money to purchase more crack cocaine. Callaghan explained that "it's extremely, extremely rare that a user that's just purchasing any type of illegal drug would possess a loaded firearm." (TR23 at 40-41, 46.)

- The firearm Bates possessed, an Intratec 9mm with an obliterated serial number, is a tool of the drug trade.

Callaghan agreed, however, that the total amount of crack cocaine in the twelve packets was consistent with personal use.

Callaghan also offered his opinion that the heroin was possessed with intent to distribute. He testified that the heroin, which held a street value of more than $200,000, would likely be kept in a secure location where it could only be accessed by individuals involved in its storage, processing, and distribution:

> I've never seized a large amount of heroin in an open location where other people had access to it. Drug organizations usually secure and secrete the evidence. You know, if there's a location that drugs are stored at, if it's this amount, they usually don't conduct sales out of it because they -- there's two reasons.
>
> The first reason is that they don't want law enforcement to detect that location, knowing that there's this much heroin in there, and the second reason is street thugs, is what we call them, you know, guys that commit a robbery on a drug house because those types of robberies are seldom, if ever, reported because the nature of what they're stealing is contraband. It's drugs. So that's the main reason why they keep a separate and secure location.

(TR23 at 45.) Callaghan also explained that the "Chicago" stamp was used to brand a drug group's product: "[B]rands are usually associated through a particular organization and

7

sometimes through a particular corner. It's actually a brand, just like a brand that you would buy in a store of any legitimate item." (TR23 at 44.)

Finally, Callaghan explained that most of the heroin in the United States is imported from Afghanistan and Colombia. He testified that, in Philadelphia, heroin is primarily dealt by individuals of Hispanic origin. Nonetheless, he explained that "the leaders of an organization in a heroin trade are [usually] Latino, but often the customers and the workers aren't." (TR23 at 69.) Callaghan testified that the volume of heroin involved in this case would be trafficked by multiple people because it is labor intensive to make small packets and the quantity was too large for one person to distribute in a timely fashion.[11]

## II. LEGAL STANDARD

A defendant faces an onerous burden on a Rule 29 motion for judgment of acquittal. United States v. Johnson, 302 F.3d 139, 149 (3d Cir. 2002). He must show that, "viewing the evidence in the light most favorable to the Government, no rational trier of fact could have found him guilty beyond a reasonable doubt." Id. Courts are bound by a "deferential burden that requires [them] to sustain the jury's verdict unless the prosecution's failure is clear." United

---

[11] The defense also elicited testimony from Quanda Crawford, Loriann Scipio, and Gail Cataldi. Crawford is a neighbor who lives at 1463 Lardner Street. She stated that a week or two after Bates and his family moved out of 1474 Lardner Street, individuals of Spanish or Mexican descent moved in. I decline to consider Crawford's testimony on the Rule 29 motion because the jury was entitled to discredit it. I decline to consider Crawford's testimony on the Rule 33 motion because it is irrelevant. Scipio is Bates' mother. I decline to consider her testimony on the Rule 29 motion because the jury was free to discredit it. I decline to consider Scipio's testimony on the Rule 33 motion because she was not credible.

Although I found Cataldi entirely credible, I decline to consider Cataldi's testimony because its relevance is limited to Toomer's credibility. The jury was entitled to fully credit Toomer's testimony. I found Toomer credible on all material issues.

States v. Mercado, 610 F.3d 841, 948 (3d Cir. 2010). "The prosecution may satisfy its burden entirely through circumstantial evidence." Id. at 845. This is true even if inferences other than guilt "are possible from the evidence offered." Id. at 849.

In contrast, on a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." Johnson, 302 F.3d at 150. The Eighth Circuit explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980). Still, a district judge may "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." Johnson, 302 F.3d at 150 (internal citations and quotation marks omitted). "Motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." Gov't of the Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987) (internal citation omitted).

## III. DISCUSSION

### A. Count I: Possession with intent to distribute 100 grams or more of heroin

#### 1. Rule 29

"The essential elements of the substantive offense of possession of a controlled substance with intent to distribute are that the defendant (1) knowingly possessed a controlled substance with (2) the intent to distribute it." United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008). Bates argues that the Government failed to prove this count beyond a reasonable doubt because it failed to show that Bates possessed the heroin.[12] Because it is undisputed that Bates lacked actual possession of the heroin, the Government was required to demonstrate constructive possession.

> [T]o show constructive possession of an illegal substance the government must submit sufficient evidence to support an inference that the individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.

United States v. Brown, 3 F.3d 673, 680 (3d Cir. 1993) (internal citations and quotation marks omitted). Mere proximity to the drug, presence on the property where it is located, or association with the person who does control the drug or property is insufficient to support a finding of possession. Id.

The facts necessary to support a finding of constructive possession vary depending on the type of structure where the drugs are found. When drugs are found in a home, as here, the Government must provide stronger evidence linking the defendant to the drugs than when the

---

[12] It is undisputed that the weight of the heroin exceeded 100 grams and that whoever possessed the heroin did so with intent to distribute.

drugs are found in the defendant's vehicle. See Brown, 3 F.3d at 683. Similarly, evidence that the defendant is an actual lessee or owner of a property can support a finding of constructive possession. Jackson v. Byrd, 105 F.3d 145 (3d Cir. 1997). The Government failed to provide any evidence that Bates owned or leased 1474 Lardner Street. Thus, I limit my discussion to cases that discuss drugs found in a building that the defendant does not own or lease.

The Government and the defense do the same, relying primarily on United States v. Brown, 3 F.3d 673 (3d Cir. 1993), and United States v. Jenkins, 90 F.3d 814 (3d Cir. 1996). In each of these cases, the Third Circuit discussed the evidence that is required to convict a non-lessee of an apartment for possession of the contraband inside. In both cases, the Third Circuit found the government's evidence insufficient to sustain the verdict. Because this is a fact-based inquiry, I discuss the facts of each of these cases in detail.

In Brown, the government presented the following evidence in support of convicting defendant Ama Baltimore of possession with intent to distribute various controlled substances:

1. [Baltimore] possessed a key to the house [where the drugs were found].

2. She arrived at the house during the search and attempted to enter the house, using her key.

3. A pair of women's shorts and a switchblade in the shorts pocket were found in the house, in a room in which no drugs were found, and Baltimore admitted that they both belonged to her.

4. After admitting that the switchblade was hers, Baltimore said to police officers: "But you can't arrest me because I am in my own house."

5. The physical evidence showed and a government witness testified that the house was being used as a "cut house," that is, a house where large quantities of drugs were stored, cut, and packaged for sale.

Brown, 3 F.3d at 680-81. The Third Circuit concluded that "while the evidence may be sufficient to show that Baltimore was residing at the Brown home and that she knew that drugs were in the house, the evidence is not sufficient to support a finding that she exercised dominion and control over the drugs." Id. at 681. It elaborated: "the evidence against Baltimore is consistent with that of someone with access to or residing at the Brown residence, but with no control over the drugs or drug packaging activities." Id. at 682.

In Jenkins, the Third Circuit found that the government also failed to present sufficient evidence to support a conviction of possession of cocaine. The government's evidence demonstrated that police found defendant Sean Jenkins and his co-defendant Sam Stallings seated on a couch immediately adjacent to a coffee table that held 55.3 grams of cocaine, two scales, two revolvers, small plastic bags, clear plastic vials, and numerous red caps. Jenkins, 90 F.3d at 816. On the floor was a loaded sawed-off shotgun. Id. Officers found no evidence that either man had been working with the cocaine. Jenkins made no attempt to hide or destroy the contraband and fully cooperated with the officers. Id. at 817. Although the district court recognized that proximity to drugs alone is insufficient, the district court upheld the conviction because it found three additional factors from which a jury could infer Jenkins' dominion and control of the cocaine:

> (i) Jenkins was not merely in the same apartment as the drugs, but was sitting on a couch immediately adjacent the table on which the drugs were found; (ii) while there was no evidence that Jenkins was a resident of the apartment, he was in his boxer shorts and a t-shirt at 1:30 a.m., which suggests that he was going to stay overnight or had been there for some time; and (iii) there were two triple-beam scales, from which it could be inferred that Stallings and Jenkins were each going to use a scale.

12

Id. at 817. The Third Circuit, however, reversed the district court, finding that nothing but proximity linked Jenkins to the drugs and that proximity alone is insufficient to establish possession. Id. at 818-20.

Bates attempts to draw parallels between the evidence in Brown and Jenkins and the evidence that the Government presented against him at trial. But the Government's evidence here is far stronger than the evidence in Brown and Jenkins. In addition to evidence that Bates previously resided at 1474 Lardner Street and possessed a key to the building, the Government presented the following evidence in support of Count I:

1. On October 7, 2008, Bates exited 1474 Lardner Street and immediately proceeded to engage in a drug transaction.[13]

2. On October 8, 2008, Bates was arrested across the street from 1474 Lardner Street. Officers found twelve packets of crack cocaine and a firearm on Bates when he was arrested.

3. On October 8, 2008, 1474 Lardner Street was a crack house where no one resided.

4. Callaghan's expert testimony that, because the street value of the drugs exceeded $200,000, only trusted members of the drug distribution group would have access to the building.

---

[13] The defense argues that, because the jury acquitted on Count III, I should decline to consider evidence that on October 7, 2008, Bates exited 1474 Lardner Street and sold crack cocaine to the CI. The Supreme Court has provided clear instruction, however, that courts should consider all of the evidence presented by the government, even if the jury acquits the defendant on some counts. See United States v. Powell, 469 U.S. 57, 65 (1984).

These additional pieces of evidence, viewed in the light most favorable to the Government and in conjunction with the entirety of the evidence in this case, are sufficient for the jury to find Bates guilty beyond a reasonable doubt of possession with intent to distribute 100 grams or more of heroin.

First, the jury could have reasonably considered that on October 8, 2008, 1474 Lardner Street was a "crack house, that is, a dwelling used exclusively for the use and distribution of drugs." Brown, 3 F.3d at 683. In 1474 Lardner Street, officers found heroin in both packaged and bulk form. They also found paraphernalia used to package heroin. In contrast, 1474 Lardner Street lacked items common to a residence. Toomer testified that there was no bedroom furniture and nothing in the kitchen or dining room. As the Third Circuit explained:

> Possession of the key to the crack house would indicate a much greater likelihood that the defendant was involved with the drugs found therein than Baltimore's possession of a key to Brown's home, which was used not only for drug-related activity but also as a residence.

Id. at 683-84. It is undisputed that, on October 8, 2008, 1474 Lardner Street was not used as a residence.

Second, the jury heard Callaghan's testimony that this quantity of heroin would be kept in a secure location to which only members of the drug organization would have access. See United States v. Soto, 959 F.2d 1181, 1185 (2d Cir. 1992) ("The jury could also have reasonably determined that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in plain view could compromise the security of the operation."); Jenkins, 90 F.3d at 825 (Cowen, J., dissenting). Callaghan explained that he has "never seized a large amount of heroin

in an open location where other people had access to it" because drug organizations tend to secure their product in order to avoid detection from law enforcement and prevent robberies from "street thugs." (TR23 at 45.)

Bates' possession of a key to 1474 Lardner Street, although insufficient by itself, holds extra significance in this context. Ownership of a key suggests that Bates could enter the building unimpeded and had unfettered access to its contents. In contrast, in <u>Jenkins</u>, the government lacked proof that Jenkins was trusted to be alone with the drugs. The Government is entitled to the inference that because Bates had a key to this "crack house" where large quantities of heroin were kept, the drug organization trusted him with unsupervised access to the heroin.

Finally, the jury could have reasonably considered evidence that Bates engaged in drug trafficking on the 1400 block of Lardner Street. The jury heard testimony that Bates exited 1474 Lardner Street immediately before selling crack cocaine to the CI. The jury could also consider that, when he was arrested on October 8, Bates was found across the street from 1474 Lardner Street with twelve bags of crack cocaine and a loaded Intratec 9mm firearm with an obliterated serial number that was a tool of the drug trade.

Considering all of the circumstantial evidence in the light most favorable to the Government, a reasonable jury could infer that Bates had dominion and control over the heroin found at 1474 Lardner Street. Thus, I will deny Bates' Rule 29 motion with respect to Count I.

**2.    Rule 33**

On Bates' Rule 33 motion for a new trial based on the weight of the evidence, I exercise judgment in assessing the Government's case and may consider evidence presented by the defense. Accordingly, I also consider evidence that Spanish-speaking individuals were involved

in the drug operation. This evidence includes Spanish names and words in a tally book, a Spanish name on a credit card that was likely used to cut and mix the heroin, and a neighbor's testimony that, after Bates moved out of 1474 Lardner Street, people of Spanish or Mexican descent "were in and out of" 1474 Lardner Street. There is no evidence that Bates speaks, writes, or understands Spanish.

Bates' argument that Spanish-speaking individuals possessed the heroin is unavailing because evidence suggesting that Spanish-speaking individuals possessed the heroin provides no basis to believe that Bates lacked dominion and control of the drug. As Callaghan testified, multiple people would be involved in trafficking this quantity of heroin. The identity of other members of the drug organization is irrelevant; the pertinent question is whether Bates was one of the members of the drug organization.

The Government successfully established that Bates possessed a key to a crack house where no one resides, that the crack house held more than $200,000 worth of heroin, that Bates exited the crack house immediately before selling drugs to a CI, and that Bates was engaged in the drug trade on the 1400 block of Lardner Street. This is sufficient circumstantial evidence to convince me that there is no "serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." Johnson, 302 F.3d at 150 (internal citations and quotations omitted).

### B. Count II: Possession with intent to distribute cocaine base

Bates argues that the Government failed to prove this count beyond a reasonable doubt because it failed to show that Bates intended to distribute cocaine base.

It is undisputed that, when Bates was arrested on October 8, he possessed twelve packets of crack cocaine. Callaghan offered his expert opinion that Bates intended to distribute the twelve packets because (1) Bates lacked any paraphernalia that would have allowed him to consume the crack and (2) Bates possessed a firearm. Callaghan explained that firearms, such as the Intratec 9mm handgun found in Bates' possession, are tools of the drug trade and that crack addicts generally lack firearms because, if they did have a firearm, they would sell it for money in order to purchase more crack.

The jury also heard evidence that, on October 7, Toomer saw the defendant engage in a hand-to-hand transaction with the CI on the steps of 1471 Lardner Street. Immediately after the transaction, the CI turned over to the police a small bag of crack cocaine. From this testimony, the jury was entitled to conclude that Bates distributed crack cocaine from the steps of 1471 Lardner Street on October 7.[14] This evidence also supports a finding that Bates, who was

---

[14] The defense argues that because the jury acquitted Bates on Count III, it necessarily rejected the Government's evidence that Bates sold crack cocaine to the CI. First, I note that there was ample evidence to support the verdict even without Officer Toomer's testimony about the October 7, 2008 sale. Evidence that Bates lacked consumption paraphernalia and that the crack cocaine, which was in twelve individually packaged bags, was held in close proximity to a firearm strongly support the verdict.

Second, the jury's decision to acquit Bates on Count III provides no basis for concluding that the Government failed to prove that Bates sold crack cocaine to the CI on October 7:

> [I]nconsistent verdicts -- even verdicts that acquit on a predicate offense while convicting on the compound offense -- should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

Powell, 469 U.S. at 65. A review for sufficiency of the evidence "should not be confused with

standing on the very same steps from which he sold crack cocaine just one day earlier, intended to distribute the twelve packets of crack cocaine he possessed on October 8. The entirety of the Government's evidence was sufficient for the jury to reasonably conclude that Bates possessed the twelve packets of crack cocaine with the intent to distribute.

In its Rule 33 motion, the defense argues that the evidence weighs against a finding that Bates intended to distribute the twelve packets of crack cocaine because: (1) whoever sold crack cocaine to the CI on October 7 sold it in a red plastic packet, while the crack cocaine on Bates' person was found in blue packets, (2) whoever sold crack cocaine to the CI supplied a cell phone number that belongs to an individual other than Bates, (3) police never found a cell phone, which is a tool of the drug trade, in Bates' possession, and (4) the amount of crack cocaine found on Bates was consistent with personal use. Despite these points, the overall weight of the evidence convinces me that this is not one of those exceptional cases where there is a "serious danger that a miscarriage of justice has occurred." Johnson, 302 F.3d at 150. Thus, I will deny Bates' Rule 33 motion on Count II.

## C. Count IV: Possession of a firearm in furtherance of a drug trafficking crime

To support a conviction on this count, the Government was required to prove beyond a reasonable doubt that: "(1) the defendant committed . . . the crime of . . . possession with intent to distribute; (2) the defendant knowingly possessed a firearm; and (3) the defendant knowingly possessed the firearm in furtherance of the crime of . . . possession with intent to distribute." United States v. Bobb, 471 F.3d 491, 497 (3d Cir. 2006). Given Bates' conviction on Count II

---

the problems caused by inconsistent verdicts." Id.

and uncontroverted evidence that Bates possessed the firearm in question, the only remaining question is whether the Government presented sufficient evidence for the jury to find beyond a reasonable doubt that Bates possessed the firearm in furtherance of his drug trafficking crime.

The mere presence of a firearm is insufficient; "the evidence must demonstrate that possession of the firearm advanced or helped forward a drug trafficking crime." United States v. Sparrow, 371 F.3d 851, 853 (3d Cir. 2004). Juries may consider the following factors in deciding whether the firearm furthered a drug trafficking crime:

> [T]he type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

Id. (citing United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000)).

It is undisputed that, when he was arrested on October 8, Bates possessed an Intratec 9mm handgun. Detective Callaghan testified that this type of firearm is a tool of the drug trade. The Government also presented evidence that the firearm had an obliterated serial number, was fully loaded with eleven rounds of live ammunition, and was easily accessible to Bates because it was tucked into the front waistband of his pants. Finally, the firearm was in close proximity to the twelve packets of crack cocaine and was found on Bates when he stood in exactly the same location where Toomer saw him engage in a drug transaction just the day before. See Iglesias, 535 F.3d at 157 (finding proximity alone sufficient evidence for a juror to conclude the firearm was used to further drug trafficking).

Because this evidence is sufficient to support the jury's verdict, I will deny Bates' Rule 29 motion on Count IV. I will also deny Bates' Rule 33 motion because I am satisfied that there is no danger that a miscarriage of justice occurred. See Johnson, 302 F.3d at 150.

## IV. CONCLUSION

For the foregoing reasons, I will deny Bates' motions.

ANITA B. BRODY, J.

xc- Speedy Trial

Copies **VIA ECF** on _____ to:

Copies **MAILED** on 08-27-2010 to:
Rashaan Bates, Deft.
Christofer Bates, Esq.

O:\ABB 2010\L - Z\United States v. Bates denies judgment of acquittal.wpd